Chief Justice Bibb
delivered the Opinion of the Court,
In October, 1815, Richard Wilkins died. In August, 1816, Scars tendered to bis executor the sum of 850 dollars, and demanded the slaves which are the, subjects of the controversy; thereafter, the executrix and executor, having refused to deliver, disposed of the slaves. In September, 1818, Scars exhibited his bill against the executrix and executor, to have an account of the hire-, and for redemption of the slaves and their increase, offering to pay the sum of $850 and interest, for which the slaves had been pledged to Wilkins in 1808, alleging ilie value of the slates greatly exceeded the sum, and their yearly value greatly exceeded the interest o *344 ffering also to pay the reasonable charge of raising the young Negroes. The bill charges that the estate was not indebted, and that the executrix and executor had parted with the slaves collusively and colourably to defeat the recovery of the complainant. John Hail is made a defendant, as having some or the slaves in possession by a colourable and collusive purchase of the executors. The bill charges, that the slaves pledged were Sophia, Rutha, Lotta and Becca; the three last being the children of Sophia, and that she lias two children since, Isham and Peter: and calls for a discovery as to the increase, and of the,manner in which the slaves have been disposed of. The prayer is for redemption and delivery of such of the slaves as can be had, and for compensation for such as cannot be had, and for general relief.
Answers of the executors.
Interlocutory decree of the circuit court.
The answers deny any fraud or collusion in the sales of the slaves, but do not allege any necessity to sell the slaves, or any debts to provide for. The answer of the executrix admits the sale of Ruthy and Isham to her son-in-law, for seven hundred dollar's; and he admits the value of them to be one thousand and fifty dollars. The answers of all the defendants admit that Peter was delivered to the defendant, John Hail, in right of his wife, as one of the heirs of the testator. Both the executrix and hxccutor state that Richard Wilkins, in his life, sold Becca to one Jonathan Ward for $300, that they have sold Lotta and Sophia, to Jonathan Ward for $700; that Sophia, Rutha, Lotta and Becca, the mother and three children were received of the complainant, by the testator, and that Isham and Peter are the after-born children of Sophia; but insist that, the right was an absolute and irredeemable property, by unconditional purchase of Sears. The answer of the executor admitted the tender and demand in August, 1310.
Upon hearing the circuit judge was of opinion that the complainant was entitled to have redemption of the slaves, tind under an interlocutor, a jury found the present value of the slaves, and their increase, (except Peter, yet in the possession of the *345 defendant Hail, in right of his wife, as heir,) at $1745, the hire $1391 50, the expense of raising the young negroes $315.
Final decree of the circuit judge.
Questions stated.
Testimony on the question whether the transaction was an absolute sale of the slaves from Sears to Wilkins, or a mortgage—
Thereupon the judge entered a decree against the executors for the $1745, and $1391 50, crediting the principal and interest upon the. $850 up to the decree, amounting to $1589 50, also the $315, for raising the negroes, leaving a balance due from the executors, of twelve hundred and thirty two dollars; and against the defendant Hail, for Peter, (his wife’s share not by him aliened,) to be delivered up to the complainant; and also decreed costs against the defendants; from which the defendants appealed.
The bill and answers make tip an issue on the question of fact, whether the transaction was an absolute and unconditional sale to Wilkins, or of an interest redeemable by Sears, upon a pledge of them as security, for the repayment of the sum of eight hundred and fifty dollars. No limitation, nor rights of creditors are involved. The bill admits a lien of $850; the answer insists on no farther or other demands against Sears whatever, but resists the complaint solely upon the footing of an absolute sale. The decree as rendered leaves the question, as presented by the bill and answers.
The counsel for the appellants have presented three questions.
1st. Of fact; whether it was a sale absolute, or a pledge for money.
2nd, The jurisdiction of a court of equity.
3rd, The propriety of decreeing hire for the slaves.
Upon the question of fact, there is no difficulty, other than the labour of reading and digesting the volume of depositions. The testator Wilkins had no bill of sale, no written evidence whatever, and it is not suggested by answer or by the statement of a single witness that any writing on the subject ever passed between the parties. When, where, or to whom, or by what means Wilkins became the creditor of Sears, or entitled to the possession of So *346 phia and her three children, does not appear except by the after mutual declarations and acknowledgements of Wilkins and of Sears.
The first account we have of any negotiation between them, is in 1807, when a.valuation of some horses to be delivered by Wilkins to Sears, was attempted. That attempt proved abortive, what was the nature of that contract, or the extent of it, does not appear; all agree that nothing was then concluded.
• The next account is, that in 1808, Wilkins went to Sears’ house, (as he slated by Sears’ appointment,) but Sears not being at home, and not returning, after some stay, Wilkins took Sophia and her children, and carried them away against the consent; of Scars’ wife. These facts appear by Gohein who was there, and by James Hawbright, who went and returned with Wilkins. At this time Gohein learned that the negroes were to remain With Wilkins until Sears paid him $850 or $900. In this possession so acquired. Sears acquiesced; and thenceforward until his death in 1815, Wilkins continued to hold the possession.
The next account is from Ledford Payne, who in the fall of 1808, after Wilkins had acquired the possession, was called upon by Wilkins and Sears to write a mortgage on the slaves for $850. They both agreed that Wilkins was to have possession of the slaves until Sears paid the sum of $8S0 ; am! whenever Sears paid the money he was to have his negroes. In his statement as to the amount, and to the right of Sears to redeem whenever he paid the money, he is supported by Wm. Robertson and Jas. Gohem. As to Sears’ right of redemption upon payment of the debt, (but the amount not stated by them.) fourteen oilier witnesses testily to Wilkins’ declarations at various times and places. The declarations of Sears when brought out by the appellants, are to the same effect uniformly.
As to the sale alleged of Beoca, made by Wilkins to Jonathan Ward, it is in confirmation of the right of redemption when explained by the testimony. *347 Wilkins stated, that he had not sold her, that she was not his to sell, that he had only dodged her to Ward, and when he went to redeem the pledge, by payment of the §300, he complained, that Ward would not let him have her unless he would give a negro boy in her stead, which Wilkins was trying to buy for him.
—Held to be a mortgage.
Mortgagor of slaves may maintain his bill to redeem, for an account of hire &c., and for compensation for the slave sold by mortgagee.
Without entering into a detail of the testimony, it is sufficint to say, the answers do not rely upon, nor claim, any lien upon the slaves after the possession acquired in 1808. If there were subsequent dealings, they are otherwise settled. The answers rely solely upon the original possession and transaction of 1808, as then an absolute and unconditional sale.
From the. testimony of seventeen witnesses as to the acknowledgements and declarations, we are satisfied it was not an absolute sale, but a mere security for money. If does appear that from 1808. when he acquired possession, thenceforth, in 1809 — 1811— 1813 — 18 IS — 1814 and in 1815, the year of his death» Wilkins uniformly acknowledged the right of Sears to redeem the slaves by the payment of the money. The transaction rested upon the mutual faith and verbal declarations of both parties that the negroes were pledged for the re-payment of $850. This right of redemption Wilkins might at any time have had his bill to foreclose; and upon it Sears has brought his bill to redeem.
But the jurisdiction of a court of chancery is questioned, because a court of law could have given complete and adequate redress,
A court of law could have sustained an action of detinue, for the slaves, after the tender of the sum, for which I hey were pledged, and damages for the detention after the tender. What then ? The executors might have sued at law for the $850, and allowing the utmost latitude, that could be supposed or requested by Sears, he could have avoided the debt, by plea of usury. For according to the legal effect,, apart from the statute of usury. Wilkins would have retained the hire, for interest up to the tender, *348 and recovered the principal. In this way Sears must have submitted to pay excessive interest, or be compelled to insist on the statute of usury, avoid the whole contract, and thereby acquire greater gain than be was willing to have, by a broach of confidence; or if not, after two suits at law, to resort to a court of equity to settle the account of hire and raising the young negroes, and principal and interest, and to close the account. He has taken the more compendious and equitable resort to a court of chancery, in the first instance, to have the transaction settled, not by avoiding the. principal nor legal interest, but upon payment of both, and having the hire set off, offering to pay the just charge for raising the young negroes.
Mortgagee in possession of slaves, shall account for their hire, be paid for raising the young slaves, recover his money with interest, and surrender the slaves, or if sold and not to be had, pay their present value-Whether it be caled vadium, pignus, mortgage or pledge in the pleading is all one, when the facts appear.
But this question of jurisdiction is settled by precedents; in Field vs. Beeler, 3 Bibb 19; Reed vs. Lansdale, Hard. 6, and Shannon vs. Speers, 2 Marsh, 311.
Thirdly it is contended,that the hire should not have been taken into aqeount. This objection is urged upon the ground that this contract is a pledge, not a mortgage; and that the holder of a pawn or pledge is not accountable for the use. The, counsel below relied on this distinction and pressed it. The learned judge below gave a good answer to it there. The counsel here have made learned arguments upon the distinction between the vadium and the, pignus of the civilians; that the holder of a pledge, may use it, without account for that use, and insisted that the bill is defective in stating the case, as of slaves “pledged or mortgaged” in the alternative. These distinctions may serve to sharpen the horns of for ensic controversy; but cannot have any practical effect in the decision of the case. As it has been said of certain discussions upon rhetoric, they leach nothing but to name the tools, so here the Roman distinction between vadium and pignus, or our distinction between mortgage and pledge, will teach nothing but the name; when that is agreed upon, the consequences and effects remain the same, whether we call this contract between Scars and Wilkins a mortgage or a pledge. In equity a vivum vadi *349 sm, or living pledge, in the use and occupation of the lender of money, and yielding annual, monthly and daily profit for keeping, will not be converted into a mortuum vadium or pignus of the to give, by the sound of a name, the lender of the money, his principal with an interest of the value of a thousand and seventy-six dollars instead of the legal interest of seven hundred and thirty-nine dollars. Upon this transaction we cannot charge, the complainant with this excess of interest, when he applies to redeem, any more than we would have let him off with redemption, by paying the principal only, in case the hire of the slaves, and charges for raising the young negroes, had reduced their profit below legal interest, in the case of Field vs. Beeler, 3 Bibb 19, the court used the words “pledged or mortgaged” as equivalent in its effects upon that transaction.
Cases of transactions proved to be mortgages of slaves, and relief given to the mortgagor in equity.
The case of Field was a pledge to Slurgus, by a hill of sale, and possession of a negro girl, delivered to Sturgus, for re-payment of a debt, taking a writing to shew the girl redeemable at at any time, upon, payment of the debt. Sturgus wanting his money, Field applied to Beeler and upon terms agreed upon, the girl was delivered to Beeler. Upon a bill against Beeler’s administrator, he attempted to use the assignment of the absolute bill of sale by Sturgus but it appeared that the contract was between Field and Beeler, to get the money for Sturgus. Therefore, the contract between Field and Sturgus had nothing to do with the question. It became, necessary to decide upon the parol evidence, as the court said, “whether the girl was absolutely sold by field to Beeler, or only pledged or mortgaged-” Upon the proof the court again said, that the parol proof was satisfactory, “that the contract was for a pledge or mortgage of the. girl, and not for an absolute sale. 'J here is hided, (said the court,) some contrariety in the evidence, but so decisive is the preponderance, that the transaction was a pledge only, that we cannot entertain a doubt upon the subject.” In this case of a pledge the court not only entertained jurisdiction, hut made the pawnee acc *350 count for hire, and the decree- dismissing the. bill was reversed. and account ordered of principal and interest and hire.
Mayes, for appellants; Crittenden, for appellee.
In Reed vs. Lansdale, (supra,) the court, not only sustained a bill for the redemption of a slave, but where the agreement was expressly, that the use of the. slave should be set off against the interest of the money; yet as the hire exceeded legal interest, the court declared so much of the agreement void, and held the lender of the money accountable for the hire, and the borrower for principal and interest, and. directed the account to be taken accordingly.
In Shannon vs. Speers, 2 Marsh. 311, the court below bad set off the hire, upon a mortgage- of slaves, the mortgagor had tendered the. mortgage money, and attempted to get dear of accruing interest, and to charge. the Joss, by death, of one of the slaves after tender, upon the mortgagor; the appellate court approved the principles of that decree.
Upon principle and precedent then, we see no cause of complaint, by the appellants, against the decree as rendered.
Decree affirmed, with damages and costs.